**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO.: 21-23960-CIV-BB**

MARIYAH MAPLE,

       Plaintiff,

vs.

CITY OF MIAMI BEACH, et al.,

       Defendants.

_____/

**DEFENDANT CITY OF MIAMI BEACH'S MOTION TO DISMISS
COUNTS 10 AND 11 OF PLAINTIFF'S THIRD AMENDED COMPLAINT
AND INCORPORATED MEMORANDUM OF LAW**

Defendant CITY OF MIAMI BEACH ("the City"), pursuant to Federal Rule of Civil Procedure 12(b)(6), moves to dismiss Counts 10 and 11 of Plaintiff MARIYAH MAPLE's ("Plaintiff") Third Amended Complaint [ECF No. 43] ("Complaint") and states:

## I.   INTRODUCTION

In her sole counts against the City, Plaintiff challenges the constitutionality, both facially and as applied, of Section 70-8(b) of the City's Code of Ordinances ("City Code"),[1] which states:

(b) It shall be unlawful for any person, after receiving a warning from a law enforcement officer, to approach or remain within 20 feet of a law enforcement officer engaged in the lawful performance of any legal duty with the intent to:

(1) Interrupt, disrupt, hinder, impede or interfere with a law enforcement officer's ability to perform such duty; or

(2) Provoke a physical response from a law enforcement officer; or

(3) Directly or indirectly harass a law enforcement officer.

Section 70-8 passes constitutional muster. As to Plaintiff's facial challenge, the language of Section 70-8(b) is neither unconstitutionally overbroad under the First Amendment nor unconstitutionally vague under the Fourteenth Amendment. Section 70-8(b) punishes conduct rather than protected speech, is adequately tailored, and furthers the governmental interest of allowing law enforcement officers to lawfully discharge their duties to protect the public without being surrounded—within 20 feet—by those who would hinder officers' performance of their legal duties or incite crowds surrounding such officers. It is irrelevant that state statutes already prohibit similar conduct; municipalities are free to legislate to protect the health and welfare of its citizens so long as state law does not expressly or impliedly preempt the field. And contrary to Plaintiff's assertions, the prohibitions in Section 70-8(b) are sufficiently specific that a person of ordinary intelligence could understand what is forbidden.

As to Plaintiff's as-applied challenge, Plaintiff has not adequately alleged facts to plausibly hold the City liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) [hereinafter "*Monell*"]. She has not alleged that a policy or custom authorized by a final policymaker caused Plaintiff to suffer any alleged constitutional deprivation—instead, all of the alleged constitutional deprivations (if any) arose from (1) an isolated incident by a handful of officers ***misapplying*** Section 70-8 and/or (2) a falsified factual predicate that would have

---

[1] Available at https://library.municode.com/fl/miami_beach/codes/code_of_ordinances.

equated to probable cause that other state law was violated, regardless of Section 70-8.

## II.   FACTS ALLEGED IN THE COMPLAINT AS MAY BE RELEVANT TO COUNTS 10 AND 11[2]

### A.   **The Incident**

On July 25, 2021, at approximately 3:00 AM, Plaintiff was walking, laughing, dancing, and posing for photos on Collins Avenue in Miami Beach. *See* Compl. ¶¶ 44, 46, 48. In the vicinity, officers were in the midst of pursuing and arresting an unrelated male. *See id.* ¶¶ 47, 49. While Officers Bercian and Campos ran past Plaintiff and her friend in pursuit of the suspect, Sgt. Stella stopped running just south of 8th Street. *Id.* ¶ 47. Plaintiff and her friend had moved to the side of the sidewalk to allow the officers to continue their chase. *Id.* As Sgt. Stella had stopped running but Officers Bercian and Campos had continued to run, there was nearly a block's distance between the two officers and the sergeant. *Id.*

Less than a minute later, Plaintiff stopped on the sidewalk in front of 713 Collins Avenue, took out her mobile telephone, and began recording an officer making an arrest. *Id.* ¶ 49. Within a minute, officers began to gather around the arrest. *Id.* Sgt. Stella and Sgt. Perez stood by idly and stared at Ms. Maple. *Id.* Other Miami Beach Police Department ("MBPD") employees were in the area within view and could see there was no crowd around Ms. Maple. *See id.* ¶¶ 49–50.

To record the arrest, Ms. Maple used her mobile telephone, and a flash on the back of her telephone indicated that she was filming. *Id.* ¶ 51. Certain of the individual Defendants (as that term is used in the Complaint) could see the flash on Ms. Maple's mobile telephone and knew that meant that she was recording. *Id.*

About a minute after Officers Bercian and Campos passed Plaintiff half a block away— and about 30 seconds after Plaintiff had begun filming—Sgt. Stella approached Plaintiff, still on the sidewalk, lifted his bicycle with two hands, and said "backup." *Id.* ¶ 53. Before Plaintiff had a chance to move, he slammed the bicycle into Plaintiff's right arm and knee. *Id.* Though Plaintiff took a step backwards to comply with Sgt. Stella's orders, within seconds, Sgt. Stella sprayed Plaintiff with pepper spray directly in the eyes from less than two feet away. *Id.* ¶¶ 54–55. Plaintiff

---

[2] The Complaint's factual allegations are taken as true for purposes of this Motion only. The City reserves all rights to dispute the Complaint's allegations, including but not limited to Plaintiff's characterizations of what is depicted in body-worn or other camera footage. The City further reserves all rights to move under Federal Rule of Civil Procedure 12(f) to strike any redundant, immaterial, impertinent, or scandalous allegations from the Complaint.

stopped filming the arrest. *Id.* ¶ 56. Other individual Defendants saw all of this. *Id.* ¶¶ 58–59.

 With the help of a friend, Plaintiff walked to her mother's car parked less than a block south, in front of 673 Collins Avenue, and on the same block as Officers Bercian and Campos. *Id.* ¶ 61. Approximately five minutes later, Plaintiff's mother called out for help. *Id.* ¶ 69. Officer Bercian spoke with Plaintiff, her mother, and her friend, all of whom explained that Plaintiff had been pepper-sprayed for standing on the sidewalk and filming an arrest without violating any law. *Id.* ¶ 70. They showed Officer Bercian a video of what had transpired. *Id.* Officer Bercian knew (based on these discussions, the video he was shown, and Officer Bercian's memory of having seen Ms. Maple less than a minute before the attack) that Plaintiff could not have refused any lawful order from Sgt. Stella before he pepper-sprayed Plaintiff. *See id.*

Nevertheless, Plaintiff was arrested and charged with violating Section 70-8. *Id.* ¶ 77. According to Plaintiff, her being pepper-sprayed, arrested, and prosecuted all emanated from her committing no acts other than recording an arrest with her mobile telephone. *See generally id.* ¶¶ 49, 51–56, 59, 70, 76–77, 89, 96, 99, 104–05, 111, 186–95. The individual Defendants purportedly facilitated the arrest and prosecution with the motive of dissuading Plaintiff from filing a civil rights excessive-force complaint against Sgt. Stella. *E.g.*, *id.* ¶¶ 77, 82, 209, 225.

The Complaint incorporates by reference, as central to Plaintiff's claims, the arrest affidavit created in connection with the incident (the "A-Form"). *See, e.g.*, *id.* ¶¶ 79.a, 142–45. A copy of the A-Form is attached to this Motion as **<u>Exhibit 1</u>** and is indisputably authentic. *See infra* Section III. The A-Form states in pertinent part:

> Officers with the bicycle response team observed a large crowd begin to grow around officers on scene. Officers gave multiple loud verbal commands for the crowd to get back and disperse.

> Sergeant Stella observed [the] majority of the crowd begin to disperse from behind officers just south of the traffic stop.

> [Plaintiff] along with several other subjects refused officers['] commands. Sergeant Stella was forced to utilize a marked police issued bicycle to create a physical barrier to protect the ongoing arrests and investigation. [Plaintiff] and other unknown subjects were unaffected by Sergeant Stella['s] bicycle tactic and stood their ground refusing to move. Sergeant Stella then produced his department issued ADS (Sabre Red 041719-E4) and deployed it in the general direction of [Plaintiff] and subjects.

> [Plaintiff] and other subjects then fled the area[,] rendering it safe for officers to continue their investigation. [Plaintiff] later flagged down Officer Bercian 2062 in front of 673 Collins Avenue referenc[ing] the spray and was arrested for violation

of City Ordinance 70-8.

Ex. 1 at page 2 of 2. Officer Bercian and Sgt. Perez knew that the A-Form was materially false because they had seen the alleged events in person or on video. Compl. ¶¶ 142–43, 234.

### B.  **The Ordinance**

The text of Section 70-8 is reproduced in its entirety on page 1 above. Section 70-8 was passed into law on June 23, 2021 and went into effect on July 3, 2021. *Id.* ¶ 40. The Complaint incorporates by reference, as central to Plaintiff's claims, statements from the first reading of the ordinance on May 12, 2021. *See id.* ¶ 36. A link to the video of that City Commission meeting is available at https://miamibeachfl.new.swagit.com/videos/120780?ts=34180 (the "May 12 Meeting Video") and indisputably authentic. *See infra* Section III. A co-sponsor stated that impetus for the legislation was to "create a penalty for those who would basically harass officers and preclude them from performing their official duties" and for the purpose of not only "protecting our officers but also protecting our residents and visitors because if our police officers can't perform their duties, that puts everyone at risk." *See* May 12 Meeting Video. The Commission noted that the state-bill analogs never made it out of committee, *see id.*; *see also* Compl. ¶¶ 30–32—but there was no indication that the bills failed to pass for any reason other than a policy prerogative. *See* May 12 Meeting Video. Unlike the state legislature, the City Commission felt it necessary to adopt the policy locally, given past incidents within the City, especially during spring break, where officers had been threatened or accosted while carrying out their official duties. *See id.*

The Complaint also incorporates by reference the events at the ordinance's second reading on June 23, 2021. *See* Compl. ¶¶ 37, 40–41. A link to the video of that Commission meeting is available at https://miamibeachfl.new.swagit.com/videos/123316?ts=12066 (the "June 23 Meeting Video"), central to Plaintiff's claims, and indisputably authentic. *See infra* Section III. Importantly, for clarity of the legislative record, one commissioner expressly addressed whether the ordinance would prohibit a bystander from videotaping an officer: "Would that be considered harassment?" *See* June 23 Meeting Video. A representative of the City Attorney's Office confirmed: "Commissioner, that would not be considered harassing, and videoing of our law enforcement officers is legally permissible under the law." *Id.* The ordinance passed unanimously. *Id.*

Despite the Commission's clear intent and the plain language of Section 70-8, Plaintiff contends that "a practice immediately evolved after the ordinance's enactment: If a person appeared to be closer than 20 feet to an on-duty officer, the officer would command the person to

move away and, if the person refused, the officer would arrest them, regardless of their intentions or protected speech." Compl. ¶ 42. Plaintiff, however, fails to identify any final policymaker who purportedly endorsed this "practice." In fact, the opposite is true: recognizing that any misconduct was attributable solely to individual officers, Mayor Dan Gelber publicly stated that "[t]he video is not who we are" and MBPD Police Chief Clements "reminded the public, 'This is not indicative of the hard-working men and women of the [MBPD] and will not be tolerated." *Id.* ¶¶ 136–38. Further MBPD training "instructed officers, 'In most cases, officers do not have the legal authority or constitutional right to stop a person from recording them in public' but that 'officers do have the right and authority to ask a person who is encroaching on a scene, materially interfering with police activity, or putting themselves in harm's way to step away.'" *Id.* ¶ 140. Plaintiff nonetheless now claims that the City violated her constitutional rights by (1) enacting Section 70-8 in the first place [facial challenge] and (2) supposedly acting with "at least deliberate indifference" as to Plaintiff [as-applied]. *See* Compl., counts 10 & 11.

### III.   LEGAL STANDARD

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Additionally, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955.

When reviewing a Rule 12(b)(6) motion to dismiss, a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009) ("On a motion to dismiss, the complaint is construed in the light most favorable to the non-moving party, and all facts alleged by the non-moving party are accepted as true."); *Iqbal*, 556 U.S. at 678. However, this tenet does not apply to

legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682).

A court considering a Rule 12(b) motion is generally limited to the facts contained in the complaint, including documents referred to in the complaint that are central to the claim. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)).

## IV.   ANALYSIS

Plaintiff's sole counts against the City are purported *Monell* claims premised on (1) facial and as-applied challenges to Section 70-8 under the First Amendment [Count 10] and (2) facial and as-applied challenges to Section 70-8 under the Fourteenth Amendment [Count 11]. A facial challenge asserts that a law "***always*** operates unconstitutionally" and will succeed only if the law "could never be applied in a constitutional manner." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009) (emphasis in original). A facial challenge does not require application to a particular set of facts. *Id.* "An as-applied challenge, by contrast, addresses whether 'a statute is unconstitutional on the facts of a particular case or to a particular party.'" *Id.* (quoting Black's Law Dictionary). None of Plaintiff's challenges—facial or as-applied, under the First or Fourteenth Amendment—can survive.

### A.   The Facial and As-Applied Challenges Are Improperly Commingled

As a threshold pleading consideration, Plaintiff commingles her facial and as-applied challenges within the same counts. These are two distinct legal theories, *see Harris*, 564 F.3d at 1308, and should have been pled as separate counts under Federal Rule of Civil Procedure 10(b). *Fla. Carpenters Regional Council v. City of Miami Beach*, No. 09-22329-CIV-ALTONAGA/Brown, 2009 WL 10699575, at *8 (S.D. Fla. Dec. 4, 2009). The Court could dismiss for clearer pleading, *id.*, but the City now addresses each theory separately on the merits.

### B.   Facial Challenge: First Amendment Freedom of Speech [Count 10]

A law is facially unconstitutional only if "no set of circumstances exists" under which the law would be valid. *United States v. Salerno*, 481 U.S. 739, 745 (1987). "The fact that [a legislative act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid…." *Id.* This "heavy burden" makes such an attack "the most difficult to mount successfully" against an enactment. *Id.*

Because a finding of facial overbreadth should be found sparingly and only as a last resort, an overbreadth challenge fails "if the measure is readily subject to a limiting construction that would remove the threat of deterrence to constitutionally protected expression." *Grand Faloon Tavern, Inc. v. Wicker*, 670 F.2d 943, 946 (11th Cir. 1982); *cf.* Compl. ¶ 265.a (alleging "no limiting construction could be placed on the ordinance").

Before reaching the question of overbreadth, however, the Court must determine whether constitutionally protected expression is, in fact, threatened by the challenged law. "In determining whether the government has violated free speech rights, the initial inquiry is whether the speech or conduct affected by the government action comes within the ambit of the First Amendment." *One World One Family Now v. City of Miami Beach*, 175 F.3d 1282, 1285 (11th Cir. 1999). As explained further herein, Section 70-8 regulates conduct—the act of approaching or remaining within 20 feet of an officer in the midst of performing a legal duty with intent to interrupt, provoke, or harass the officer—and any effect on speech is incidental or otherwise not protected by the First Amendment. Thus, the Court need not reach any First Amendment overbreadth analysis.

Even if Section 70-8 affects speech within the ambit of the First Amendment, the next inquiry is to determine whether the ordinance is content-neutral or content-based. *Id.* at 1286. If the government action is content-neutral, the court applies a "time, place, and manner" analysis. *Id.* But if the government action is content-based, the court applies a strict scrutiny test. *Id.*; *see also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163–64 (2015). Here, Section 70-8 is content-neutral and a reasonable restriction on time, place, and manner. Alternatively, if strict scrutiny applies, the ordinance is narrowly tailored to further a compelling government interest. Either way, the law is sufficiently capable of a limiting construction so as to defeat a facial challenge.

### 1.   Section 70-8 criminalizes conduct, not speech

Section 70-8 prohibits conduct, not protected speech. Simply videotaping an officer, without more, is not enough to satisfy the elements of Section 70-8. Instead, Section 70-8— referred to colloquially as the "Respect My Space" ordinance—is focused on giving law

enforcement officer *sufficient room* (i.e., a distance of at least 20 feet) to carry out their official duties without *intentional* intrusion. The plain text of the ordinance makes it unlawful "for any person, after receiving a warning from a law enforcement officer, *to approach or remain within 20 feet of a law enforcement officer engaged in the lawful performance of any legal duty with the intent to*" interfere, provoke, or harass the officer. City Code § 70-8(b) (emphasis added). The ordinance was enacted specifically with mob intimidation or crowd interference with lawful police activity in mind. *See generally* May 12 Meeting Video; June 23 Meeting Video.

If a law's effect on speech is only incidental to its primary effect on conduct, there is no First Amendment violation, as "it has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). The Eleventh Circuit has recognized "the longstanding principle that valid regulations of conduct might sweep up some speech at their margins." *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1138 (11th Cir. 2022) (internal quotations omitted). But First Amendment protection is extended only to conduct that is "inherently expressive." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006). The conduct at issue in Section 70-8 is *approaching or remaining within 20 feet* of an officer performing their[3] official duties, after receiving a warning, *with the intent to* interfere, provoke, or harass; this conduct is not "inherently expressive." *Cf. id.* at 61–68 (where law conditioned universities' federal funding on granting military recruiters access equal to that provided to other recruiters, the law regulated conduct rather than "inherently expressive" speech; rejecting claim that the law prevents expression of disapproval of the military).

Even conduct that is "intertwined with expression and association" is subject to regulation. *Cox v. Louisiana*, 379 U.S. 559, 563 (1965). *Cox* addressed the constitutionality of a state statute that provided: "Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty pickets or parades in or near a building housing a court of the State of Louisiana . . . shall be fined not more than five thousand dollars or imprisoned not more than one year, or both." *Id.* at 560. Despite recognizing that "[t]he conduct which is the subject of this

---

[3] The City uses the pronoun "their" to refer to an officer of any gender.

statute—picketing and parading—is" intertwined with expression, the Supreme Court rejected First and Fourteenth Amendment challenges to that statute: "We deal in this case not with free speech alone, but with expression mixed with particular conduct. . . . We hold that this statute on its face is a valid law dealing with conduct subject to regulation so as to vindicate important interests of society and that the fact that free speech is intermingled with such conduct does not bring with it constitutional protection." *Id.* at 563–64.

Similarly, speech that is integral to criminal conduct—such as obstructing law enforcement officers in the execution of their legal duties, *see* Fla. Stat. § 843.02, or willfully, maliciously, and repeatedly harassing a person, *see* Fla. Stat. § 784.048(2)—earns no constitutional protection. *See, e.g.*, *United States v. Clum*, 607 F. App'x 922, 928 (11th Cir. 2015) (citing *Giboney*, 336 U.S. at 498)). In *Clum*, the defendants used words and acts "to facilitate their illegal tax scheme by enticing clients, whom they then instructed and advised to claim fraudulent refunds for taxes the clients never paid." *Id.* Criminal punishment for those words and acts did not run afoul of the First Amendment, because those words and acts "were not abstract discussions removed" from the criminal conduct. *Id.* So too here: speech in furtherance of obstructing an officer's carrying out their official duties is not protected.

Plaintiff will likely rely on *City of Houston, Texas v. Hill*, 482 U.S. 451 (1987), in support of her First Amendment argument, but that case is materially distinguishable based on the text of the challenged ordinance. There, the Houston ordinance stated: "It shall be unlawful for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty, or any person summoned to aid in making an arrest." *Id.* at 455. The Supreme Court held that the only portions dealing with ***conduct***—the prohibitions on "assault[ing]" or "strik[ing]"—were expressly preempted by state law and therefore were unenforceable. *Id.* at 460–61 & n.8 The remaining portions made it unlawful to "in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty" and thus regulated speech because the law "prohibit[ed] verbal interruptions of police officers." *Id.* at 461 & n.9.

Section 70-8 is unlike the Houston ordinance. First, Florida state law does not preempt the conduct-based prohibitions in the City ordinance. Under Florida law, political subdivisions like municipalities are free to fill legislative gaps as long as there is no intent by the state legislature to expressly or impliedly preempt the field. *See, e.g.*, *Miami-Dade Cnty. v. Miami Gardens Square One, Inc.*, 314 So. 3d 389 (Fla. 3d DCA 2020) (state executive order did not preempt the entire

field of COVID-19 emergency measures, so county curfew orders were not enjoined); *Phantom of Clearwater, Inc. v. Pinellas Cnty.*, 894 So. 2d 1011 (Fla. 2d DCA 2005) (chapter 791 of Florida Statutes did not expressly or preemptively preempt the field of fireworks regulation, so county could enact regulations concerning the operation of businesses involving fireworks so long as the regulations did not directly conflict with state law). In *Hill*, the Texas Penal Code had express preemption provisions that stated "any species of physical assault on a police officer is encompassed within the provisions of the Texas Penal Code" and "***no governmental subdivision or agency may enact or enforce a law that makes any conduct covered by this code an offense subject to a criminal penalty***." 482 U.S. at 460–61 (cleaned up, emphasis added). There is no such express preemption in Title XLVI of the Florida Statutes concerning, *inter alia*, obstruction of justice (chapter 843) or assault, battery, or willful, malicious & repeated harassment (chapter 784).[4]

True, there are some state statutes which could encompass acts that would also constitute acts described in Section 70-8(b)(1) through (b)(3). *See, e.g.*, Fla. Stat. § 843.02 (resisting officer without violence). But the City can and does criminalize those same state misdemeanors so that City prosecutors can press charges even if state prosecutors do not. *See* City Code § 70-1; *Jaramillo v. City of Homestead*, 322 So. 2d 496, 498 (Fla. 1975) ("A municipality may enact an ordinance which creates an offense against municipal law for the same act that constitutes an offense against State law."). There is no implication that the Florida Legislature intended to preempt Section 70-8. *See Phantom of Clearwater*, 894 So. 2d at 1019 (explaining that courts imply preemption only when (1) the state legislative scheme is so pervasive as to evidence an intent to control and (2) strong public policy reasons exist for finding implied preemption).

Second, Section 70-8 is far narrower than the Houston ordinance. While the Houston

---

[4] *But see, e.g.*, Fla. Stat. § 812.1725 (in the Title XLVI chapter titled "Theft, Robbery, and Related Crimes," providing that "[a] political subdivision of this state may not adopt, for convenience businesses, security standards which differ from those contained in ss. 812.173 and 812.174, and all such differing standards, whether existing or proposed, are hereby preempted and superseded by general law."). The Legislature plainly knows how to incorporate preemption language within Title XLVI when it intends to; the inclusion of preemption language in chapter 812 must be read to exclude an intent to preempt in chapters 843 and 784 (among others). *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress  includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)).

ordinance criminalized any "verbal interruptions of police officers," 482 U.S. at 461 & n.9, without the need for any physical action and without any distance limitation, Section 70-8 criminalizes the *physical act*, after receiving a warning, of approaching or remaining within 20 feet of a law enforcement officer engaged in the lawful performance of any legal duty with the intent to interfere, provoke, or harass that officer. Indeed, under Section 70-8, a "verbal interruption," without more, would not violate the law, whereas it would under the Houston law.

### 2.   Content-neutral Section 70-8 is reasonably limited in time, place and manner

Even if Section 70-8 could be read to regulate speech instead of conduct (and it should not be), it is content-neutral, regulating speech only to the extent that it obstructs police officers attempting to discharge their duties. Section 70-8 is not aimed at forbidding or suppressing a particular viewpoint or message. It does not matter what is being said; the only alleged harassment-speech that could come within the ambit of 70-8(b)(3) is harassment-speech made with the intent to thwart an officer in the course of their law enforcement activities.

Because Section 70-8 is content-neutral, the court analyzes whether the ordinance contains permissible time, place and manner restrictions[5] using the intermediate scrutiny standard of review—i.e., whether the ordinance is narrowly tailored to achieve a significant government interest and leaves open ample alternative channels of communication. *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1267 (11th Cir. 2007); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 798 n.6 (1989) (noting that "[w]hile time, place, or manner regulations must also be 'narrowly tailored' in order to survive First Amendment challenge, we have never applied strict scrutiny in this context"). Content-neutral restrictions "need not be the least restrictive or least intrusive means of" serving the government's interests. *Ward*, 491 U.S. at 798.

Plaintiff alleges that Section 70-8 "serves no legitimate purpose because existing laws, *see, e.g.*, Fla. Stat. §§ 843.02, 784.048, already prohibit conduct that harasses people or obstructs law enforcement officers . . . ." Compl. ¶ 265.d. The existence of related state laws, however, does not obviate the legitimate *local* interest in prohibiting harassment or obstruction in a specific way based on prior instances of crowds disrupting lawful police activity in the City. *See supra* at IV.A.2; *see also* May 12 Meeting Video; June 23 Meeting Video.

---

[5] Even if Section 70-8 criminalized the mere act of videotaping an officer (and it does not), the First Amendment right to videotape police conduct is "subject to reasonable time, manner and place restrictions . . . ." *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000).

Municipalities unquestionably have a legitimate interest in minimizing interference with law enforcement officers engaged in their official duties, to protect not only the officers but also the public at large whose interests are being protected by law enforcement efforts. *See, e.g.*, *Colten v. Kentucky*, 407 U.S. 104, 109 (1972) ("The State has a legitimate interest in enforcing its traffic laws and its officers were entitled to enforce them free from possible interference or interruption from bystanders, even those claiming a third-party interest in the transaction."); *Berman v. Parker*, 348 U.S. 26, 32–33 (1954) (describing municipal interests in police power, generally). And Section 70-8 is narrowly tailored to further that interest because it is limited in time (during the course of an officer's carrying out their legal duties), place (within 20 feet of that officer), and manner (where the violator has specific intent to interfere, provoke, or harass the officer). The ordinance leaves open ample alternative channels of communication—indeed, if any speech is prohibited by Section 70-8 (and the City does not so concede), that speech is lawful if it takes place 25 feet away from the officer. The law survives intermediate scrutiny.

### 3. Alternatively, Section 70-8 survives strict scrutiny

There is no basis to find that Section 70-8 is a content-based regulation, but even if it were, it still passes even the rigorous strict scrutiny test. Under that test, a law is constitutional "only if it constitutes the least restrictive means of advancing a compelling government interest." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005). Here, the City has a compelling interest in ensuring that officers can carry out their duties without crowding or mob intimidation. And Section 70-8 is the least restrictive means of advancing that interest; it is even more restrictive than the proposed state bills that set a 30-foot radius. *See* Compl. ¶¶ 30–31. Though it does not apply to speech that harasses "firefighters, building inspectors, or teachers," Compl. ¶ 265.b, a law "need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015).

### 4. Either way, Section 70-8 is capable of a limiting interpretation

As explained above, a facial overbreadth challenge will only succeed if the challenged law is incapable of any limiting construction that would render it constitutional. Here, Section 70-8 is capable of such a limiting reading. As in the case of *Colten v. Kentucky*, 407 U.S. 104, 111 (1972), this Court can construe Section 70-8 to mean that "a crime is committed only where there is no bona fide intention to exercise a constitutional right—in which event, by definition, the statute infringes no protected speech or conduct—or where the interest so clearly outweighs the collective

interest sought to be asserted that the latter must be deemed insubstantial."

In *Colten*, the statute at issue criminalized disorderly conduct, which was defined to mean when a person, "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, . . . [c]ongregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse . . . ." *Id.* at 108. The Kentucky Court of Appeals determined that the statute could be "reasonably construed" so as to "not prohibit the lawful exercise of any constitutional right:

> We think that the plain meaning of the statute, in requiring that the proscribed conduct be done "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," is that the specified intent must be the predominant intent. Predominance can be determined either (1) from the fact that no bona fide intent to exercise a constitutional right appears to have existed or (2) from the fact that the interest to be advanced by the particular exercise of a constitutional right is insignificant in comparison with the inconvenience, annoyance or alarm caused by the exercise.

*Id.* at 108–09 (quoting 467 S.W.2d 374 (Ky. 1971)). The Supreme Court agreed. *Id.* at 109–11.

Section 70-8 is capable of the same construction. The ordinance prohibits the refusal to remain 20 feet away from an officer, after receiving a warning, only if the predominant intent of not remaining at such a distance is to interfere, provoke, or harass the officer lawfully engaged in their legal duties. Section 70-8 thus survives any facial overbreadth challenge.

The ordinance is also capable of the limiting construction identified by Florida's First District Court of Appeal in analyzing the alleged overbreadth of the resisting-without-violence statute (Fla. Stat. § 843.02). *See Wilkerson v. State*, 556 So. 2d 453, 455–56 (Fla. 1st DCA 1990). In *Wilkerson*, the court considered the statute's "operative words, i.e., 'obstruct or oppose' an officer." *Id.* at 455. The court held that the term "obstruct" means "to interfere with, impede, or retard" and therefore "contemplates acts or conduct apart from verbal expressions, which operate to physically hinder or impede another in doing something." *Id.* But the word "oppose" could "be used to connote either (1) conduct or acts of physical resistance and opposition, or (2) verbal expression of conflicting or differing ideas; but obviously its use in the first sense does not connote the second sense." *Id.* Examining the statute as a whole, the court held that "the use of 'oppose' in conjunction with 'obstruct' manifests a clear and unambiguous legislative intent to proscribe only acts or conduct that operate to physically oppose an officer in the performance of lawful duties." *Id.* at 455–56. This construction avoided a potential overbreadth issue. *Id.* at 456. Section 70-8 is

quite analogous: reading 70-8(b) in its entirety, rather than cherry-picking clauses in isolation, urges a limiting construction whereby a person only violates the law if they approach or remain within 20 feet (after a warning) of an officer discharging their legal duties with the intent to **physically oppose or resist** the officer (or encourage others to physically oppose/resist the officer).

### C.  Facial Challenge: Fourteenth Amendment [Count 11]

Next, Plaintiff alleges that the face of Section 70-8 is unconstitutionally vague. To prevail on a facial void-for-vagueness challenge, the challenger "must either show that the ordinance fails to give fair warning of what constitutes a wrongdoing or that the statute lacks objective enforcement standards." *DA Mortg.*, 486 F.3d at 1271. "The traditional test for whether a statute or regulation is void on its face is if it is so vague that 'persons of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

Importantly, the constitutional guarantee against vagueness does not guarantee "mathematical certainty from our language" in every legislative enactment; the text can have "flexibility and reasonable breadth, rather than meticulous specificity," so long as it is reasonably ascertainable what the ordinance as a whole prohibits. *Grayned v. City of Rockford*, 408 U.S. 104, 1140 (1972). The vagueness doctrine "is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Colten*, 407 U.S. at 110.

Section 70-8 contains the permissible flexibility and reasonable breadth but is still capable of being understood by those with reasonable intelligence. Plaintiff alleges that it is impossible to know what the terms "interrupt," "disrupt," "interfere," "provoke," and "directly or indirectly harass a law enforcement officer," Compl. ¶ 269.a, but that allegation is entitled to no deference. A multitude of non-vague laws prohibit similar conduct. *E.g.*, *Colten*, 407 U.S. at 110 ("Here the statute authorized conviction for refusing to disperse with the intent of causing inconvenience, annoyance, or alarm. . . . We agree with the Kentucky court when it said: 'We believe that citizens who desire to obey the statute will have no difficulty in understanding it . . . ."); *Dreske v. Holt*, 536 F.2d 105 (5th Cir. 1976)[6] (Florida's resisting-without-violence statute, Fla. Stat. § 843.02,

---

[6] *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

which made it a crime to "obstruct or oppose any such officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer," was not unconstitutionally vague); *Wilkerson*, 556 So. 2d at 455–56; *Bouters v. State*, 659 So. 2d 235, 237–38 (Fla. 1995), *cert. denied*, 516 U.S. 894 (1995) (holding that Florida's stalking statute, Fla. Stat. § 784.048, including its use of the term "harasses," was not unconstitutionally vague); *see also O.P-G v. State*, 290 So. 3d 950, 957–58 (Fla. 3d DCA 2019) (school disruption statute, Fla. Stat. § 877.13, barring "knowing" actions "specifically intended 'to disrupt or interfere with' school functions" was not unconstitutionally vague); *Bradshaw v. State*, 286 So. 2d 4 (Fla. 1973) (holding Florida's disorderly conduct statute, Fla. Stat. § 877.03, was not unconstitutionally vague because "not every detail is required to be set forth in the statute so long as the prohibitive conduct is in such language that it is understood by the average citizen"); *State v. Beasley*, 317 So. 2d 750 (Fla. 1975) (holding that Florida law criminalizing "inciting or encouraging a riot" was not unconstitutionally vague); *Scullock v. State*, 377 So. 2d 682 (Fla. 1979) (holding that Florida law criminalizing the "offering" of violence was not unconstitutionally vague). The Court need not check its common sense at the courthouse door.

Moreover, to succeed on a facial vagueness challenge, "the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982). Plaintiff again contends that no constitutional interpretation is possible, Compl. ¶ 269.b, but that is not so. *See supra* at IV.A.4. Where a legislative enactment such as an ordinance does not define a specific term, a court should interpret the ordinance "in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty., Ga.*, 140 S.Ct. 1731, 1738 (2020). As to the allegedly vague terms in paragraph 269.a of the Complaint, Dictionary.com[7] provides the following primary definitions: "interrupt" means "to cause or make a break in the continuity or uniformity of (a course, process, condition, etc.)"; "disrupt" means "to cause disorder or turmoil in"; "interfere" means "to come into opposition, as one thing with another, especially with the effect of hampering action or procedure (often followed by *with*)"; "provoke" means "to anger, enrage, exasperate, or vex"; and "harass" means "to disturb or bother persistently; torment, as with troubles or cares; pester" or alternatively "to intimidate or coerce, as with persistent demands or threats." The City

---

[7] *Available at* https://www.dictionary.com/.

uses this alternative definition of "harass" in officer training.  *See* Compl. ¶ 140.

To the extent Plaintiff claims she cannot ascertain what it means to "indirectly harass" a law enforcement officer, a reasonable person nevertheless could. *Cf. Fla. Ass'n of Prof. Lobbyists, Inc. v. Div. of Legislative Info. Servs. of the Fla. Office of Legislative Servs.*, 523 F.3d 1073, 1079 (11th Cir. 2008) (in interpreting statute prohibiting lobbyists or principals from making "directly or indirectly" and prohibiting government officials from knowingly accepting "directly or indirectly" any expenditure, holding: "we do not regard the term 'indirect' as vague: a person of common intelligence would understand that it applies to expenditures or compensation paid through a third party"); *Carlson v. State*, 405 So. 2d 173, 174 (Fla. 1981) (holding that Florida RICO statute's phrase "conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity" was not unconstitutionally vague). An example of indirect harassment is encouraging a third-party—say, a person that the officer is in the process of arresting—to intimidate or coerce the officer, as with persistent demands or threats. Such an interpretation is consistent with the very purpose behind Section 70-8: to prevent mob intimidation and crowd threats while officers are carrying out their duties. *See generally* May 12 Meeting Video; June 23 Meeting Video.

Any vagueness concerns are further dispelled by the fact that Section 70-8 contains both a warning and scienter requirement. "[T]he Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates*, 455 U.S. at 489 & n.14 (collecting cases). Section 70-8 requires that a putative violator first be given a warning—only ***after*** that warning; only ***after*** the violator continues to approach or remain within 20 feet of the officer in the midst of lawfully carrying out a legal duty; and only ***if*** the violator has ***specific intent*** to interfere, provoke, or harass the officer, can the violator be lawfully arrested. *Cf. O.P-G*, 290 So. 3d at 958 ("Given this context and the causal relationship between the *mens rea* of the perpetrator and the requisite disruption, the statute gives fair notice to ordinary people of common intelligence as to the prohibited conduct and provides minimal requirements to guide law enforcement in order to prevent police officers, prosecutors, and juries from pursuing the personal predilections" (internal quotations and alterations omitted)).

### D.  **As-Applied Challenges – No *Monell* Liability**

Assuming without conceding that Plaintiff may be able to prove that the individual

Defendants violated her constitutional rights as alleged in Counts 1 through 9 of the Complaint, Plaintiff has not alleged—and cannot prove—that those violations were caused by official policies or customs approved by a final policymaker.

It is well-settled that a municipality, like the City, may not be held vicariously liable for the acts of its employees based on *respondeat superior* under section 1983. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). Rather, to state a claim against the City under section 1983, Plaintiff must allege she suffered a deprivation of her rights pursuant to an official policy or custom of the City. *Id.* at 694; *see also Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir. 1991). Here, Plaintiff does not allege the existence of a "custom"; she alleges only that Section 70-8 is an "official policy of the municipality[.]" Compl. ¶¶ 266, 270.

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (internal citation omitted). "[I]t is not enough for a [section] 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its ***deliberate*** conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

Put differently, a few municipal employees' bad-faith enforcement of an otherwise-valid law does not transmute that misapplication of the law into official policy. For example, in *Brown v. City of Pittsburgh*, Pittsburgh enacted an ordinance creating 15-foot "buffer zones" around any entrance to hospitals or health-care facilities; in these zones, no one could "knowingly congregate, patrol, picket or demonstrate." 586 F.3d 263, 266 (3d Cir. 2009). The purpose of the law was to limit aggressive protests and confrontations at health care facilities providing abortions. *Id.* After concluding that the buffer zone was facially content-neutral and constitutional, *id.* at 273–76,[8] the Third Circuit considered an anti-abortion advocate's as-applied claim "that the Pittsburgh police have discriminated on the basis of viewpoint in enforcing the statute, applying its restrictions only to pro-life protesters like [her] and not to clinic workers and volunteers." *Id.* at 292. The Court

---

[8] This facial analysis has been modified in part by *McCullen v. Coakley*, 573 U.S. 464 (2014).

rejected the advocate's theory that "the Ordinance itself" was the "policy" giving rise to *Monell* liability. *See id.* at 292–94. Rather, where a law is facially valid, "a plaintiff whose evidence consists solely of the incidents of enforcement themselves must establish a pattern of enforcement activity evincing a governmental policy or custom of intentional discrimination . . . ." *Id.* at 294; *see also id.* at 294–96 (ultimately finding "no basis for inferring that the City has a policy or custom of enforcing the Ordinance based on the content of the speech or the viewpoint of the speaker").

Plaintiff here does not satisfy the "moving force" culpability-and-direct-causal-link requirement. While it is true that Section 70-8 was officially enacted by the City, the alleged as-applied constitutional violation—i.e., the use of Section 70-8 to pepper-spray[9] and ultimately arrest Plaintiff for doing nothing more than using her cellphone's videocamera—has never been adopted as municipal policy. In fact, the City Commission voted to enact Section 70-8 with the understanding that it would never be used in such a way. *See* June 23 Meeting Video.

And as to the cause for Plaintiff's arrest and prosecution, Plaintiff pleads herself out of *Monell* liability: she specifically alleges that the individual Defendants arrested and prosecuted her **because** they were trying (unsuccessfully) to prevent her from filing a civil rights excessive-force complaint based on Sgt. Stella's unjustified pepper-spraying. *See, e.g.*, Compl. ¶¶ 73, 77, 82, 209, 225–26, 256–58. The individual Defendants would have had that alleged motivation regardless of whether Section 70-8 had ever been enacted. *See, e.g.*, *id.* ¶¶ 73 ("Sgt. Stella told Officer Bercian that [Plaintiff] had not violated any valid law but that he wanted him to arrest her because she had requested medical care and could sue him for excessive force."), 209 ("Officers Bercian, Rueda, and Acevedo would not have arrested [Plaintiff] but for her intention to report Sgt. Stella's excessive force."), 225 ("Officers Bercian, Rueda, Acevedo and Sgts. Perez and Stella would not have prosecuted [Plaintiff] but for her intention to report Sgt. Stella's excessive force.").

For constitutional violations to be sufficiently "widespread" to amount to official policy, they need to occur with frequency; random acts or isolated incidents are not enough. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1294 (11th Cir. 2004). This principal controls over

---

[9] Moreover, nothing in Section 70-8 authorizes the use of pepper-spray: Section 70-8(c) only provides that "[a] violation of this section shall be punished in accordance with section 1-14 of the City Code," with section 1-14 authorizing punishment "by a fine not exceeding $500.00 or by imprisonment for a term not exceeding 60 days, or by such both fine or imprisonment." If anything, the "moving force" behind Sgt. Stella's pepper-spraying was his violation of the City's use of force policies, Compl. ¶¶ 173–179—not the existence of Section 70-8.

Plaintiff's conclusory allegations that the City acted "with at least deliberate indifference" to deprive her of her First and Fourteenth Amendment freedoms. Compl. ¶¶ 266, 270. "Deliberate indifference is a stringent standard of fault." *Brown*, 520 U.S. at 410. To meet the "deliberate indifference" standard, a plaintiff must first show "a 'persistent and widespread practice' of constitutional deprivations." *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986). "A few isolated instances would not suffice to meet this high burden; rather, Plaintiff must show unconstitutional behavior that was 'obvious, flagrant, rampant, and of continued duration.'" *Fisher v. Miami-Dade Cnty.*, 114 F. Supp. 3d 1247 (S.D. Fla. 2015) (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)).

Thus, to survive dismissal, Plaintiff would need to sufficiently allege a widespread pattern of indifference, known by the City's final policymakers, concerning whether law enforcement officers, interpreting and applying Section 70-8, would routinely violate the rights of citizens by using that law to pepper-spray and/or arrest people for doing nothing other than videotaping with their phones, and that the City's policymakers consciously disregarded those risks over a continued duration of time prior to Plaintiff's injury. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1161 (11th Cir. 2005). Plaintiff here alleges no such thing. The only other alleged incident in the Complaint occurred ***after*** the incident on July 25, 2021. *See* Compl. ¶ 130. And the June 23 Meeting Video makes clear that the City Commission understood that mere videotaping, without more, ***would not*** be interpreted as a violation of Section 70-8. Plaintiff again pleads herself out of a *Monell* claim: Section 70-8 went into effect on July 3, 2021, and upon learning of the events that occurred on July 25 & 26, 2021, the City immediately suspended the law pending further training, which was provided within a week. *See* Compl. ¶¶ 40, 130–33, 136–140.

To the extent Plaintiff would suggest that any of the individual Defendants constitutes a "policymaker" within the meaning of *Monell*, that suggestion is wrong. The plaintiff "must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused that particular constitutional violation in issue." *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1330 (11th Cir. 2003). Plaintiff alleges only that certain City police officers have testified that: "a practice immediately evolved after the ordinance's enactment: If a person appeared to be closer than 20 feet to an on-duty officer, the officer would command the person to move away and, if the person refused, the officer would arrest them, regardless of their intentions or protected speech." Compl. ¶ 42. That supposed "practice" is contrary to the text

of Section 70-8 and was never approved or willfully disregarded by any City final policymakers.

There is one final reason why Plaintiff's *Monell* claim fails: a central feature of Plaintiff's Complaint is that Sgt. Stella, Officer Bercian, and Sgt. Perez allegedly falsified the A-Form to make it seem like a valid factual predicate existed to arrest under Section 70-8. *See* Compl. ¶¶ 142–43, 234. Obviously, it is not City policy to falsify an A-Form; Plaintiff does not even try to allege as much. But to the extent Plaintiff would argue that the enactment of Section 70-8 was the "justification" for her alleged constitutional deprivations (Compl. ¶¶ 266, 270), that cannot possibly be so. The factual predicate in the A-Form—regardless of whether it is true—sufficiently gives rise to probable cause to arrest Plaintiff under Florida's resisting-arrest-without-violence statute. *Cf.* Ex. 1 at page 2 of 2 (describing Sgt. Stella's actions allegedly taken "to protect the ongoing arrests and investigation" and Plaintiff's alleged "refusing to move" until being pepper-sprayed, at which time Plaintiff "fled the area[,] rendering it safe for officers to continue their investigation") *with* Fla. Stat. § 843.02 ("Whoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree . . . ."). Thus, that factual predicate—which would have been falsified no matter what, to prevent Plaintiff from pursuing her excessive-force claim—supports a finding of probable cause to arrest irrespective of Section 70-8.

Plaintiff goes through pains to note that the A-Form "only accused [Plaintiff] of violating Miami Beach Ordinance 70-8," Compl. ¶ 144, but that is irrelevant. "The validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992); *see also id.* at 1119–21 (holding that arrest was proper based on bribery, unlawful compensation, and unlawful possession of money in jail even though arrest report reflected only conveying tools into jail to aid escape, for which defendant was not charged). Indeed, "[w]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." *United States v. Saunders*, 475 F.2d 5, 7 (5th Cir. 1973)). Thus, even if the identified individual Defendants falsified the A-Form (and again, the City only assumes as much for purposes of this Motion), their falsified factual predicate would give rise to probable cause whether or not Section 70-8 had ever been enacted. The City's official action in enacting the ordinance therefore could not have been the moving force behind Plaintiff's arrest and prosecution.

RAFAEL A. PAZ, CITY ATTORNEY
CITY OF MIAMI BEACH
1700 CONVENTION CENTER DRIVE
4TH FLOOR-LEGAL DEPARTMENT
MIAMI BEACH, FLORIDA 33139
TEL: (305) 673-7470
FAX: (305) 673-7002

By: /s/*Henry J. Hunnefeld*
HENRY J. HUNNEFELD
First Assistant City Attorney
henryhunnefeld@miamibeachfl.gov
Florida Bar No. 343811
By: /s/*Freddi Mack*
FREDDI MACK
Senior Assistant City Attorney
freddimack@miamibeachfl.gov
Florida Bar No. 111623

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of December, 2022, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which in turn will automatically generate a Notice of Electronic Filing to all parties in the case who are registered users of the CM/ECF system.

/s/*Freddi Mack*